1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11   LESLIE MURRAY,                    )
                                       )
12            Plaintiff,               )    Civil No. 04-533-HU
                                       )
13        vs.                          )
                                       )
14   JO ANNE BARNHART,                 )    FINDINGS AND RECOMMENDATION
     Commissioner of Social Security,  )
15                                     )
              Defendant.               )
16   _____)

17   Rory Linerud
     P.O. Box 1105
18   Salem, Oregon 97308
          Attorney for plaintiff
19
     Karin Immergut
20   United States Attorney
     District of Oregon
21   Craig J. Casey
     Assistant United States Attorney
22   888 S.W. Fifth Avenue, Suite 1000
     Portland, Oregon 97204-2024
23
     Daphne Banay
24   Special Assistant United States Attorney
     701 Fifth Avenue, Suite 2900 MS/901
25   Seattle, Washington 98104
          Attorneys for defendant
26
     HUBEL, Magistrate Judge:
27
          Leslie Murray brought this action pursuant to Section 205(g)
28

     1 - FINDINGS & RECOMMENDATION

of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for Supplemental Security Income (SSI) benefits.

## Procedural Background

Ms. Murray filed an application for SSI benefits in February 2001. The application was denied initially on June 19, 2000, and on reconsideration on October 5, 2000. Ms. Murray did not appeal further, which made the October 5, 2000 reconsideration decision a final decision. Ms. Murray filed the current application for SSI benefits on March 16, 2001, with a protected filing date of February 20, 2001. The application was denied initially and on reconsideration. A hearing was held before Administrative Law Judge (ALJ) James M. Caulfield. On December 24, 2003, the ALJ issued a decision finding Ms. Murray not disabled. On March 19, 2004, the Appeals Council declined Ms. Murray's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born October 12, 1956, Ms. Murray was 47 years old on the date of the ALJ's decision. She alleges disability beginning March 5, 1997, based on a combination of impairments, including osteoarthritis, sleep apnea with associated memory loss, asthma, carpal tunnel, shortness of breath and fatigue. She has a high school education and a year of college. Her past relevant work is as a telemarketer and hotel housekeeper.

## Medical Evidence

On August 21, 1996, Ms. Murray presented at the emergency room of Sacred Heart Medical Center in Eugene, complaining of pain over

2 - FINDINGS & RECOMMENDATION

her entire leg, hip and foot. Tr. 229. She denied any specific cause for the pain, which had been present for four days. Tr. 229. She denied any back pain and was "very nonspecific" as to where the pain might be located. Id. Examination was unremarkable, except that she was noted to be "very obese." Id. She was given 800 mg. of ibuprofen and one Percocet tablet. Id.

On November 6, 1996, Ms. Murray presented at the emergency room for complaints of a cough for the previous two months, pain in the upper jaw from a tooth, and shortness of breath. Tr. 224. It was noted that she is a smoker. Id. She was given a prescription for Bactrim and a prepack of Vicodin. Tr. 225.

On December 30, 1996, Ms. Murray was admitted to the emergency room with complaints of intermittent fever, sore throat, ear pain, cough, and dental pain. Tr. 219. She was diagnosed with an upper respiratory and bronchial infection, right otitis media, and acute dental pain with multiple dental caries. Tr. 220. She was prescribed amoxicillin and was given a prescription for Vicodin. Id.

On February 16, 1997, Ms. Murray was admitted to the emergency room, saying she had been struck in the left temple with a fist in a domestic assault about 20 hours earlier. Tr. 212. She complained of local pain and swelling, as well as a cough and shortness of breath. Id. An X-ray of the skull was negative for fracture. Tr. 213. She was diagnosed with acute bronchitis and flu syndrome with reactive airway. Id. She was given Keflex and Vicodin to be used as needed. Id. She was also advised to stop smoking. Tr. 214.

Ms. Murray was incarcerated from April 1997 to March 1999. Tr. 376-424. During that time, she was treated for depression with

3 - FINDINGS & RECOMMENDATION

Paxil, Vistaril and trazodone. Tr.379-386. Her prison records indicate a 15-year history, from age 24 to age 39, of opiate, crack, and alcohol use. Tr. 387. In October 1997, she was diagnosed with carpal tunnel on the right and given a wrist splint. Tr. 412, 413. In December 1997, she was diagnosed with carpal tunnel on the left. Tr. 414. While in prison she worked as a dishwasher, in the night laundry and as a head cook. Tr. 408, 475.

On May 4, 1999, Ms. Murray was seen by Elizabeth Quillin, M.D., of PeaceHealth Medical Group. Tr. 280. Dr. Quillin recorded that Ms. Murray reported a history of hypertension, complained of occasional muscle cramping at night, and also wished to discuss weight loss, saying her weight had increased by 100 pounds while she was in prison. Id.[1] Ms. Murray had signed and understood a diet pill contract. Id. On that date, she weighed 289. Blood pressure was 122/90. Id. Dr. Quillin thought Ms. Murray's hypertension was adequately controlled with Captropril and triamterene hydrochlorothiazide. She was started on Fastin with a 1,800 calorie a day diet and regular exercise program. Id. Dr. Quillin also prescribed a multivitamin and potassium supplement for myalgias and cramping. Id.

On June 8, 1999, Ms. Murray was seen for follow-up of obesity. Tr. 279. She reported doing well on Fastin, having lost more than two pounds and having no side effects. Id. Ms. Murray complained of low back discomfort when standing for prolonged periods of time,

---

[1] Ms. Murray's prison health care records show that her weight was 252 upon admission in May 1997, and that she gained approximately 30 pounds during her first year of incarceration. Tr. 408, 383.

4 - FINDINGS & RECOMMENDATION

and requested a note from Dr. Quillin so that "when she applies for a job she is not held to the fact that she needs to stand for long periods of time." Id. Dr. Quillin asked Ms. Murray to obtain records to substantiate her history of back strain, at which point Dr. Quillin would consider writing a letter. Id.

On July 13, 1999, Ms. Murray asked for a refill of the Fastin prescription, but was refused because she had not fulfilled her contractual obligation of losing at least two pounds a month. Id.

On July 6, 1999, x-rays were taken of Ms. Murray's cervical and lumbar spine. Both showed minimal osteophytosis. Tr. 282. Another x-ray of the lumbar spine taken August 25, 1999, showed straightening of the lumbar lordosis, but otherwise was normal: disc space heights were adequately maintained, there was no compression fracture, and sacral and sacroiliac joints were intact. Tr. 281.

On August 14, 1999, Ms. Murray presented at the emergency room complaining of low back pain after making a bed. Tr. 206. She was diagnosed with lumbar strain and given a prescription for Percocet. Tr. 206-07.

On August 23, 1999, Ms. Murray saw Laura Jakious, M.D., of PeaceHealth Medical Group, for back pain. Tr. 278. Upon examination, she had tenderness in the right lumbar region, but none over the spinous processes. Seated straight leg raising exacerbated her back pain on both sides. Id. Dr. Jakious diagnosed lumbar strain and gave her an injection, along with a prescription for 20 Norco and Flexeril. Id.

On August 31, 1999, Ms. Murray called requesting additional Norco, which was denied by Dr. Jakious, who wrote, "we do not

5 - FINDINGS & RECOMMENDATION

advocate the use of long-term narcotic treatment for this sort of problem." Id.

On September 21, 1999, Ms. Murray was seen by William G. Moshofsky, M.D. of PeaceHealth Medical Group, for complaints of low back pain, and with a request to be restarted on Fastin. Tr. 277. Dr. Moshofsky wrote that Ms. Murray seemed "more determined now to lose that weight," and noted that she was "dramatically overweight at 284 lbs." Id. Dr. Moshofsky restarted on her on Fastin for a month to see if she could lose two pounds over the next month. Id.

On October 3, 1999, Ms. Murray presented at the emergency room complaining of severe left ear pain. Tr. 200. She was diagnosed with acute left otitis media and dental pain, and given two Percocet tablets and amoxicillin. Tr. 200-201.

On November 7, 1999, Ms. Murray was admitted to the emergency room complaining of low back pain. Tr. 194. She was diagnosed with lumbar paraspinous muscle strain and given prescriptions for 12 diazepam, 5 mg., and 16 Percocet for pain. Id. She was encouraged to lose weight. Id.

On November 18, 1999, Ms. Murray was seen by Mark Lyon, M.D. of PeaceHealth, for complaints of right hip discomfort over the past two weeks. Tr. 276. Dr. Lyon wrote that she was "doing well" on the Fastin, having lost 11 pounds. Blood pressure was good. Id. She had no limp and there was no tenderness over the greater trochanter and no real discomfort with range of motion of the hip, but some muscular tenderness at the proximal thigh anteriorly and in the inguinal area. Id. Dr. Lyon diagnosed proximal thigh strain.

On December 17, 1999, Ms. Murray was seen by Dr. Lyon for complaints of "very mild mood, memory, sleep, and appetite

6 - FINDINGS & RECOMMENDATION

difficulties, mild anhedonia." Tr. 275. She was taking Doxepin, an antidepressant, for insomnia. She also reported ongoing difficulties with right leg and back discomfort, stating that she had had to use pain medicine off and on in the past, including narcotics. Id. She said she believed she could avoid getting addicted as well as continue to lose weight with the aggressive therapy. Id.

Her weight was down 4 ½ pounds. Dr. Lyon diagnosed mild depression and sleep dysfunction; obesity, on medical management; and chronic back pain without evidence of neuropathy. Id. She was given a prescription for 30 Vicodin, to last at least a month, Fastin, and increased dosage of Doxepin. Id.

On January 19, 2000, Ms. Murray saw Dr. Lyon for a recheck of her weight and for pain in the spine, right leg, and elbow. Tr. 274. Dr. Lyon wrote that she had "known cervical spine osteoarthritis, as well as lumbar spine osteoarthritis, documented on x-ray of 7-6-99." Id. [2]

Dr. Lyon noted that Ms. Murray had not lost weight on the Fastin. Id. He noted "minimal osteoarthritic changes of the hands," but no evidence of synovitis. Reflexes were 2+ and equal; strength was normal. She had some right medial epicondylitis without synovitis and pain in the distribution of the fasciae latae with hip rotation, but no actual joint pain. Id. There was minimal tenderness over the greater trochanter. Id.

---

[2] The July 7, 1999 x-rays of the lumbar and cervical spine showed minimal osteophytosis, suggesting minimal osteoarthritis. A second x-ray of the lumbar spine in August 1999 was normal. Tr. 281, 282.

7 - FINDINGS & RECOMMENDATION

Dr. Lyon discontinued the Fastin because he thought medication was not helping Ms. Murray control her weight. Id. Ms. Murray entered into a contract for her pain medicine. Id.

On April 25, 2000, Ms. Murray was evaluated for pain in multiple joints by William J. Bernstein, Ph.D., M.D. Tr. 232. Examination revealed no obvious deformity or crepitus about any joint. Tr. 233. There was no instability of the knees. Id. She had full range of motion about the neck, shoulders, elbows, wrists, hips, knees and ankles, except that she had zero degrees of adduction of her hips bilaterally because of obesity. Id.[3] Range of motion about the lumbar spine was also full. Id. Cranial nerves were intact. Id. Motor examination was normal. Id. Coordination was intact, although gait was somewhat unsteady because of knee pain. Tr. 234. She could not tandem, and could not do a deep knee bend, or walk on her heels or toes, because of obesity. Id. Deep tendon reflexes were normal. Id. Sensory examination was normal. Id. Dr. Bernstein concluded that Ms. Murray did not require any ambulatory aids. Id. He noted that she came across as a "rather straightforward historian and examinee, without a hint of embellishment." Id.

X-rays of the lumbar spine taken on April 25, 2000, showed some anterior degenerative changes without focal fracture or destructive bony process. Tr. 235. The interspaces appeared preserved. Id.

On April 27, 2000, Ms. Murray saw Dr. Lyon again to follow up

---

[3] Although Dr. Bernstein's report states that Ms. Murray's weight was 150, this was confirmed to be a typographical error on October 4, 2000. Tr. 255. The weight should have been 250. Id.

8 - FINDINGS & RECOMMENDATION

on chronic pain issues. Tr. 273. She said she thought ibuprofen was more helpful than Naproxen, and that she was continuing to benefit from Vicodin. Id. She was continuing to lose weight. Id.

Social Security reviewing physician Martin Kehrli, M.D., completed a Residual Physical Functional Capacity Assessment on June 14, 2000. Tr. 240-45. In his opinion Ms. Murray was capable of lifting 20 pounds occasionally and 10 pounds frequently; stand or walk for at least two hours in an eight-hour workday; and sit about six hours in an eight-hour workday. No postural, manipulative, visual, communicative, or environmental limitations were found.

Social Security reviewing psychologist Frank Lahman, Ph.D. completed a mental impairment assessment on June 13, 2000. Tr. 246-54. His conclusion was that Ms. Murray had a nonsevere impairment of mild depression. Tr. 246. He found no limitations on activities of daily living or maintaining social functioning, and opined that only "seldom" would Ms. Murray have deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. Tr. 253.

On June 20, 2000, Ms. Murray was seen by Dr. Quillin for follow-up on back and leg pain. Tr. 272. She told Dr. Quillin she had been diagnosed with arthritis by an independent disability physician. Id. She continued to receive 30 Vicodin a month, without showing signs of abuse. Id. Weight was improved, down to 239 from 254 at her last visit. Id.

Ms. Murray saw Dr. Quillin on August 14, 2000, telling her that the Vicodin "just doesn't seem to be enough." Tr. 271. She said she continued to have low back pain, and asked that her Vicodin be increased to 45 a month. Id. Upon examination, she was

9 - FINDINGS & RECOMMENDATION

tender to palpation over the entire lower back. Id. Dr. Quillin increased her to Vicodin extra-strength, 45 tablets per month. Id. Dr. Quillin referred her to James Morris, M.D., for evaluation. Id.

On October 23, 2000, Ms. Murray saw Dr. Quillin, complaining of leg pain that prevented her from taking computer classes. Tr. 270. She requested a muscle relaxant to take at night. Id. She complained of pain on both sides, sometimes in her hips, sometimes in her knees, if she walked for any length of time. Id. Upon examination, she was tender to palpation diffusely in the hips and knees. Dr. Quillin observed that "[h]er amount of tenderness seems slightly out of proportion to physical exam." Id. Dr. Quillin planned to x-ray Ms. Murray's right knee and hip and gave her Soma. Id.

On February 15, 2001, Ms. Murray was seen for shortness of breath at Lane Community College Student Health Services. Tr. 369. She was given prescriptions for prednisone and hycodan. Tr. 369. She continued treatment with the Student Health Center between February 2001 and April 2003, primarily for problems with shortness of breath, for which she was given Flovent and Albuterol. See tr. 371-74. She was also advised to stop smoking. Tr. 371.

On July 11, 2001, Ms. Murray had an initial pain consultation with James Morris, M.D., a pain specialist. Tr. 293. She reported pain of four years' duration in her neck, back and right leg. Id. She described the pain as "bad," with her leg giving out on her. Id. She said she was a student and had trouble negotiating stairs and ramps. Id. She had difficulty sleeping and felt that she needed something stronger than Doxepin, although Doxepin made her groggy at school. Id. Ms. Murray reported that she was doing well in

10 - FINDINGS & RECOMMENDATION

school, earning As and Bs, and that she was proud of having lost weight, wanting to lose more. Id.

Ms. Murray said the pain "just began" in 1997. Id. She described it as aching and stabbing, with numbness, spasms, and stiffness. Id. She said the pain was worsened by twisting, by sitting, standing or walking for 15 minutes or more, and by changes in the weather. Id. She denied being nervous or depressed, and denied memory problems, difficulty concentrating, mood swings, and irritability. Id.

Upon examination, she had full range of motion in her shoulders and upper extremities. Tr. 295. Tender points were absent. Range of motion in the back and lower extremities was restricted by pain in the right hip and right knee. Id. Tender points were present in the right thigh. There was perhaps a slight effusion of the right knee. Id. She rated her pain at 9 out of 10. Id.

Dr. Morris's diagnosis was multifocal musculoskeletal aches and pains, right hip and knee pain. Tr. 296. Dr. Morris did not think Ms. Murray met the criteria for fibromyalgia, and commented, "It's not clear whether she has degenerative joint disease accounting for her right hip and knee pain." Id.

He thought her pain condition was complicated by her history of chemical addiction, but he detected no addictive behavior around her opioid medications. He did not detect deception or drug seeking. Id. For these reasons, he thought Ms. Murray was probably a suitable candidate for time-contingent, long-acting opiate therapy in the treatment of her pain symptoms, but thought it would be reasonable to require an addiction evaluation before committing

11 - FINDINGS & RECOMMENDATION

to long-term therapy. Id. Dr. Morris also thought adjuvant approaches to pain management could be useful, including pharmaceutical approaches, acupuncture, TENS unit, massage, and chiropractic. Id.

He recommended a physical therapy evaluation for recommendations about self care and safe exercise. He encouraged her to take some Doxepin every night to help her sleep and to try Wellbutrin, which he prescribed. Dr. Morris noted that if Ms. Murray found two Vicodin per day insufficient, he would recommend Methadone. Id.

X-rays taken on July 17, 2001, showed moderate degenerative joint disease in the right knee, with possible intra-articular loose body, and moderate degenerative joint disease with possible osteitis (inflammation of the bone) at the sacral iliac joint. Tr. 298.

On July 28, 2001, Ms. Murray was examined by David Morrell, M.D., for complaints of neck, low back and leg pain caused by arthritis, obesity, high blood pressure, and asthma. Tr. 261. Id.

Ms. Murray stated that she has right knee pain without instability, right hip pain, and neck pain. Id. She said she almost always uses a cane to walk. Id. She cannot sit or stand for too long, and needs the cane if she walks more than about 30 feet. Id.

She stated that she had been diagnosed with asthma five years previously, and that she experiences shortness of breath on exertion with walking and particularly with stairs. She told Dr. Morrell she had quit smoking a week earlier. Id. She denied being hospitalized or intubated for asthma, and was unable to describe how often she got exacerbations of her asthma. Id.

Ms. Murray said she was able to do household chores, but with difficulty. Tr. 262. She crocheted and did needlepoint, and attended Lane Community College, although it was difficult for her to attend class because climbing stairs caused shortness of breath. Id. Her current medications were Captopril, Dyazide, Vicodin, Magnesium, an antidepressant, ibuprofen, Soma, Ambien, and Albuterol inhalers. Id.

Dr. Morrell noted that Ms. Murray sat comfortably in the examination room and was not short of breath. Id. She got on and off the table without difficulty and could take her shoes off without difficulty. Id. There were no inconsistencies or poor effort on examination. Id.

Her height was 5'3" and her weight was 230. Id. Blood pressure was 128/80. Id. She had decreased balance and was unable to stand on one foot. Tr. 263. She walked with a limp and had pain with walking on her toes and heels. Id. She had difficulty walking in a straight line in a heel-toe fashion, secondary to decreased balance and pain. Id.

Cervical range of motion was within normal limits, but flexion caused pain. Id. Left cervical lateral bending was also limited by pain. Id. The left hip joint's range of motion was within normal limits, but there was slightly decreased range of motion in the right hip. Id. The left knee joint had normal range of motion, but there was slightly decreased range of motion on the right. Ankle joints were normal. Id. Straight leg raising was negative bilaterally. Tr. 264. Upper extremities, including wrists, had normal range of motion. Id.

There was tenderness over the right greater trochanter of the

right hip and over the medial/lateral/patella femoral joint spaces of the right knee. Id. There was no joint effusion or instability. There was tenderness in the lower midline portion of the neck with associated paravertebral muscle spasm, and she was tender on the right side of the lower neck. Id. There was no joint crepitus, joint effusion, or trigger point. Id. Motor strength and tone were normal; sensory exam was normal; reflexes were normal; cranial nerves were intact. Id.

Dr. Morrell attributed her pain to moderately advanced osteoarthritic changes of the right hip joint and of the right knee. Tr. 265.

On July 30, 2001, Ms. Murray saw Kurt Brewster, M.D. at PeaceHealth complaining of right knee locking. Tr. 362. She reported that she was "doing fine" the night before, but when she got out of bed she noticed that her knee was locking, with pain over the kneecap. Id. She told Dr. Brewster that she had a "pain doctor," but she had not called him for the problem. Id. Physical examination revealed no obvious erythema over the knee. There was some mild swelling and erythema, but Ms. Murray did not appear to be in marked distress. Id. Dr. Brewster wrote,

> My primary concern with the patient is coming to multiple doctors for pain medicine control. ... I did have patient contact with Dr. Morris ... [and] they stated that they were going to take care of the patient's flare-up of pain.

Id.

On August 2, 2001, Ms. Murray saw Dr. Jakious with a request for a note to say that she is currently unable to work so that she can get food stamps. Tr. 361. Dr. Jakious gave her a note. Id.

On September 10, 2001, Ms. Murray was seen again by Dr.

14 - FINDINGS & RECOMMENDATION

Morris. Tr. 290. Ms. Murray reported that her exercise consisted of walking sometimes. Id. She was walking with a cane. She had good range of motion in her neck. Range of motion was adequate in her shoulders and upper extremities, without joint abnormalities. She had some right knee mild effusion and some joint tenderness, but no warmth. Id. Gait and stance were abnormal with right antalgic limp. Id. Dr. Morris diagnosed osteoarthritis, fibromyalgia syndrome (based on 10 out of 18 tender points), and right hip and knee pain. Tr. 291. Dr. Morris thought Ms. Murray was "doing satisfactorily," and did not think significant changes were warranted. Id. Dr. Morris thought her level of activity was suboptimal. Id. He was unwilling to increase her medication dosage or to prescribe benzodiazepines for anxiety. Id.

On October 22, 2001, Social Security reviewing physician Mary Ann Westfall completed a Residual Physical Functional Capacity Assessment. Tr. 300-305. In her opinion, Ms. Murray could lift 20 pounds occasionally and 10 pounds frequently, stand or walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday; she was limited to climbing stairs, stooping, kneeling, crouching or crawling only occasionally, and was to avoid fumes, odors, dusts, gases, and poor ventilation. Id. She based her findings on Dr. Morris's finding that Ms. Murray's exam was stable, and that she was doing satisfactorily, with no changes warranted. Tr. 305.

Ms. Murray saw Dr. Morris on November 12, 2001. Tr. 334. Ms. Murray reported that since the change in the weather she was in a bit more pain, but that her sleep had improved since starting Ambien. Id. She was walking with a cane. She was currently taking

classes at Lane Community College. Id. She was maintaining addiction recovery efforts. Id. She was taking Vicodin under an opiate contract with Dr. Quillin, as well as Wellbutrin and Doxepin. Id.

Upon examination, minimal pain behavior was noted. Id. Fourteen out of 18 tender points were positive. Id. Dr. Morris's diagnoses were osteoarthritis and fibromyalgia syndrome. Id.

Dr. Morris wrote that she was appropriately using short-acting opioid therapy for pain control without signs of abuse or misuse. Id. However, her pain report was unsatisfactory and Dr. Morris thought conversion to long-acting, time-contingent therapy was warranted, if carefully supervised. Id. Dr. Morris thought Ms. Murray's addictive history limited her choices to Methadone, and perhaps sustained release morphine. Id. He advised weight loss, conditioning, and physical therapy as well. Id. He recommended that Dr. Quillin prescribe Methadone, 2.5 mg. every 8-12 hours to start, and not to exceed 10 mg. three times a day in the long term, with a very gradual upward taper if needed to reach 30 mg. per day. Id.

On November 16, 2001, Ms. Murray saw Dr. Quillin to discuss medications. Tr. 360. Dr. Quillin wrote that Dr. Morris was suggesting that she begin Methadone. Id. Dr. Quillin wrote that she was going to suggest that Dr. Morris take over the opioid prescribing for the next 12 months. Id.

On November 29, 2001, Ms. Murray saw Dr. Morris and reported stabbing pain in her neck, right hip and knee. Tr. 332. Walking increased her pain. Id. She was using Vicodin for pain relief. Id.

On examination, 15 out of 18 tender points were positive. Dr. Morris thought she was an appropriate candidate for long-acting

16 - FINDINGS & RECOMMENDATION

opiate therapy, and prescribed Methadone, 5 mg. three times a day. Tr. 333.

Ms. Murray saw Dr. Morris again on December 27, 2001. Tr. 330. She reported that her pain was somewhat better, but did not feel that the pain medication was strong enough. Id. She also complained of anxiety attacks, accompanied by shortness of breath and fear of dying, for the past two weeks, two to three times a day. Tr. 330. No precipitating events were identified. Id. Dr. Morris instructed Ms. Murray to increase her bedtime dose of Methadone and prescribed Buspar for anxiety. Tr. 331.

On January 24, 2002, Ms. Murray reported to Dr. Morris that her pain was unchanged. Tr. 328. However, she said she was having improved function despite pain, being able to go to school and maintain her activities of daily living. Id.

Upon examination, nine out of 18 tender points were positive. Tr. 329. Dr. Morris gave her a prescription for water exercise at the YMCA, increased her Methadone dosage, and discussed trying Zanaflex, a muscle relaxant. She was encouraged to decrease her smoking. Id.

On February 21, 2002, Ms. Murray told Dr. Morris the pain was worse in her right shoulder and that she was having trouble walking without a cane. Tr. 326. She also reported left elbow pain, increased neck stiffness with right shoulder pain, and non-restorative sleep. Id. She did not feel that Zanaflex had helped her and she was no longer taking it. Tr. 327. Dr. Morris decided to start her on Skelaxin for muscle tension and spasms. Id. Ms. Murray said she was not currently swimming because she was in too much pain to walk to the YMCA. Id.

17 - FINDINGS & RECOMMENDATION

Dr. Morris increased her methadone to 10 mg. three times a day and prescribed Ambien to help her sleep. Id.

On February 28, 2002, Ms. Murray saw Dr. Quillin for complaints about anxiety. Tr. 353. She was currently on Buspar, but reported getting anxious at night and being unable to sleep. Id. Dr. Quillin increased her dosage of Buspar and told Ms. Murray to get her pain medication and muscle relaxants prescribed by Dr. Morris. Id.

On March 11, 2002, Ms. Murray saw Dr. Quillin for complaints of shortness of breath. Tr. 357. She was "very anxious," and said she needed something to stop her panic attacks. Id. Ms. Murray reported that for about the last six days she had felt as though her chest was tight and she was unable to breathe. Id. Dr. Quillin observed that Ms. Murray appeared anxious and nervous, "repeating herself and repeating what I say as well." Id. Dr. Quillin diagnosed anxiety with panic exacerbated by asthma and emphysema. Id. She prescribed Klonopin and inhalers. Id.

On March 18, 2002, Ms. Murray returned for follow-up on her asthma. Tr. 356. She reported that her anxiety was improved. Id. Dr. Quillin concluded that Ms. Murray's asthma and anxiety were stable with current medications. Id.

Ms. Murray saw Dr. Morris on March 21, 2002, reporting that her pain was worse and that she was having increased anxiety attacks. Tr. 322. She reported that Dr. Quillin had changed her inhalers, increased her Buspar dose, and added Klonopin. Id. She reported exercising on machines three times a week. Id.

On April 18, 2002, Ms. Murray reported to Dr. Morris that her pain was unchanged since the last visit, with "shocks" going

18 - FINDINGS & RECOMMENDATION

through her leg. Tr. 318. She reported still having some anxiety attacks in spite of the Buspar, but said they were mild, and that the Klonopin was helping. Id. She said she had not yet started her swimming or water exercise program, and she was encouraged to do so. Tr. 319. Dr. Morris increased her Methadone to 40 mg. per day. Id.

Ms. Murray saw Dr. Morris on May 16, 2002. Tr. 316. She reported that her pain was worse, and that her right leg had given out on her a couple of times. Id. Dr. Morris observed that Ms. Murray exhibited marked pain behavior, leaning heavily on her cane, and unable to get up on the examination table. Id. Dr. Morris thought Ms. Murray was making an effort, but he encouraged her to find a way to exercise on a regular basis. Tr. 317. He increased her Methadone to 20 mg. three times a day. Id.

Ms. Murray saw Dr. Morris on June 13, 2002 for follow-up. Tr. 313. She reported that the pain was worse, although her pain was not lasting as long as it used to. Id. Dr. Morris thought Ms. Murray was "doing fairly well with her intractable pain management at this time," with stable symptoms. Tr. 314. He wrote that she was appropriately using opiate therapy for pain control without signs of deviation from prescription, abuse or misuse. Id. However, because of her pain, Dr. Morris increased her Methadone dose to 25 mg. three times a day. Id.

Ms. Murray reported that she had been given the opportunity to work as head cook at a Girl Scout camp in Florence for the summer. Id.

On July 30, 2002, Ms. Murray saw Dr. Moshofsky for arthritis pain, to request pain medication in Dr. Quillin's absence. Tr. 355.

19 - FINDINGS & RECOMMENDATION

She complained of pain in her right wrist, with a swelling which she believed to be arthritis. Id. Examination revealed a ganglion cyst, which Dr. Moshofsky aspirated. Id.

Ms. Murray saw Dr. Morris on August 8, 2002, reporting that the pain was worse in the afternoon and evening and asking to increase her Methadone dose. Tr. 310. She continued to have right knee pain, worse with walking, but felt that swimming was beneficial. Id. Dr. Morris wrote, "She's enjoying an improved sense of well-being this summer in spite of the pain she does have." Id. Dr. Morris thought Ms. Murray was doing well with pain management and that treatment appeared appropriate. Tr. 311. She was encouraged to continue swimming. Her Methadone was increased to 30 mg. three times a day. Id.[4]

On August 29, 2002, Ms. Murray was seen for complaints of foot pain. Tr. 353. Dr. Moshofsky thought it was a neuroma with a callus over it, with the dermal surface showing indications of early cellulitis. Id. She was given Keflex and a referral to a podiatrist, as Dr. Moshofsky thought she might need surgery to correct the problem. Id.

Ms. Murray saw Dr. Morris on September 19, 2002, reporting that she was satisfied with her current dose of medication. Tr.

_____

[4] This 90 mg per day dosage was prescribed despite Dr. Morris's stated intention in November 2001, only nine months earlier, that Ms. Murray's Methadone dosage be given a "very gradual upward taper if needed" not to exceed 30 mg per day "in the long term." Tr. 334. I note further that during the interim between November 2001 and August 2002, as he steadily increased Ms. Murray's Methadone dosage, Dr. Morris's chart notes refer to "minimal" pain behavior, tr. 334, pain that is "somewhat better," tr. 330, "improved function," tr. 328, "pain unchanged," tr. 318, and "pain not lasting as long as it used to." Tr. 313.

309. School was starting the following week and she was looking forward to it. Id. Ms. Murray reported that her pain was an aching pain, with its onset at night, and that it was improved with medication, swimming, and leg lifting. Her medications were Accupril, Albuterol inhaler, Ambien, Atrovent, Buspar, Doxepin, Dyazide, Flovent, ibuprofen, Tylenol, Klonopin, Methadone three times a day, Vicodin as needed, Welbutrin, and Zanaflex. Tr. 309. She was smoking a pack of cigarettes a day. Id.

Dr. Morris wrote that Ms. Murray "appears healthy. Minimal pain behavior noted." Id. Dr. Morris thought her symptoms were stable, with some waxing and waning as expected, and that treatment appeared appropriate. Tr. 308. It was agreed that no further pain management was required, and that she would return to her primary care physician for continued care. Id.

On October 4, 2002, Ms. Murray saw Dr. Quillin for pain in her right wrist and worries about sleep apnea. Tr. 351. Her exercise tolerance had decreased and she was having shortness of breath, with fatigue and dyspnea on exertion. Id. Dr. Quillin reiterated her recommendation to continue a regular exercise program, beginning with three days a week and increasing to five days a week after three weeks. Tr. 352. Dr. Quillin ordered a prescription for a walker "that she can use if needed around the house." Id. Dr. Quillin refilled her Vicodin and Methadone prescriptions. Id.

On November 25, 2002, Ms. Murray saw Dr. Quillin for pain in her forearm, radiating to her elbow. Tr. 348. Dr. Quillin diagnosed right forearm tendinitis, exacerbation of fibromyalgia and ganglion cyst. Id. She was tried with a Lidoderm patch, a local analgesic, and her Buspar dosage was increased. Id.

21 - FINDINGS & RECOMMENDATION

On December 1, 2002, Ms. Murray was seen at the Sacred Heart Medical Center's Sleep Disorders Center. Tr. 343. She reported a history of waking up gasping at night and feeling very anxious. Id. She was very sleepy during the day. Id. She underwent an overnight polysomnogram on December 1, 2002, and was found to have severe obstructive sleep apnea. Tr. 344. However, she subsequently achieved good results with Continuous Positive Airway Pressure (CPAP) administered through a Nasal Aire canula. Tr. 337.

On January 29, 2003, Marylin Datzman, M.D. wrote that Ms. Murray was "doing great" with her CPAP. Tr. 340. Ms. Murray reported that she was feeling much better rested. Id.

## Hearing Testimony

Ms. Murray appeared at the hearing with a walker. Tr. 452. She testified that she was living on a quad at Lane Community College. Tr. 453. She was in her third year at LCC, majoring in human services. Tr. 454. She was taking a one and a half hour course in case working, twice a week; a one and a half hour course in transitions and change, which also met twice a week; and spending 10 to 20 hours a week doing clinical work, volunteering with a school counselor at Jefferson Middle School. Tr. 456, 459. Most of her volunteer activity was done from home, on the telephone. Tr. 460.

Ms. Murray said she worked part-time, 25-30 hours a week, for six months as a telemarketer in 2000, and full-time as a telemarketer for approximately a month. Tr. 466.[5]

---

[5] In the Work History Report section of her Social Security application, Ms. Murray stated that she worked as a telemarketer for approximately a year, from March 1999 through November 1999

22 - FINDINGS & RECOMMENDATION

Ms. Murray testified that she is unable to stand more than about 20 minutes at a time, or 30 minutes leaning on the walker. Tr. 480. She said she was unable to sit any more than an hour, and that during her one and a half hour classes, she had to get up and move around at least twice. Tr. 481. She estimated that she could walk about the length of two basketball courts before she was in pain. Tr. 482. She said she uses her cane every day and her walker on occasion. Tr. 483. She said she had been so limited for about two years. Tr. 488. She takes a nap for an hour to two hours twice a day. Tr. 491.

She testified that her hands swell three or four times a week, tr. 484, although the ALJ noted that she was wearing four rings on her left hand and a ring on her right hand. Id. She said she studies about three hours in the evening, about four times a week, in bed. Tr. 485. She is able to vacuum the floor of her room, tr. 488, and stand up to wash dishes. Tr. 489. Once or twice a month, she picks up her crocheting for a couple of hours and makes a scarf. Tr. 490.

Ms. Murray's friend Cary Loffelmacher testified that she has known Ms. Murray for about 12 years, and sees her three or four times a week, during different times of the week. Tr. 498. The day before, she said she saw her from two to four-thirty in the afternoon. Id. Ms. Loffelmacher testified that Ms. Murray seemed uncomfortable sitting, that it was hard for her to get in and out of the car, and that she was unable to walk for long periods of

---

and from January 2000 to February 2000, between "5+" and 7 hours a day. Tr. 119, 123-125.

23 - FINDINGS & RECOMMENDATION

time. Tr. 499. She could not recall how long Ms. Murray had been using the walker. Tr. 500.

**Standards**

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities

24 - FINDINGS & RECOMMENDATION

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her

age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Ms. Murray contends that the ALJ erred in 1) determining that she had the residual functional capacity to do medium level work; 2) applying the Medical-Vocational Guidelines, despite the presence of non-exertional limitations; and 3) failing to develop the record.

1.   ALJ's finding that Ms. Murray was capable of work at the
     medium exertional level

Ms. Murray argues that there is no evidentiary support in the record for the ALJ's finding that she had the residual functional capacity to perform work at the medium exertional level.

Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). A person capable of doing medium work is deemed able to do sedentary and light work. Light work

26 - FINDINGS & RECOMMENDATION

involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. Id. at (b). Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Id. at (a). Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Id. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. Id.

The Residual Functional Capacity Assessment form completed by Social Security reviewing physician Mary Ann Westfall on October 22, 2001, tr. 300-305, states that Ms. Murray is capable of lifting 20 pounds occasionally and 10 pounds frequently, standing or walking at least two hours in an eight-hour workday, and sitting about six hours in an eight-hour workday, with the additional limitation of climbing ramps and stairs, stooping, kneeling, crouching and crawling only on an occasional basis, and avoiding fumes, odors, dusts, gases, and poor ventilation.[6] The ALJ did not address this evidence in his decision. There is no evidence in the record indicating that Ms. Murray is capable of the exertional

---

[6] Social Security reviewing physician Martin Kehrli, M.D., completed a Residual Physical Functional Capacity Assessment on June 14, 2000. Tr. 240-45. His findings were the same as those of Dr. Westfall, except for the limitation of avoiding fumes, odors, dusts, gases, and poor ventilation. The Commissioner argues that this evidence is should not be considered because it relates to Ms. Murray's prior application for SSI, for which the October 5, 2000 reconsideration denying benefits is binding because Ms. Murray did not appeal further. I find it unnecessary to reach this issue because of the similarity between this evidence and that of Dr. Westfall.

27 - FINDINGS & RECOMMENDATION

requirements of medium work. I agree with Ms. Murray that this finding by the ALJ was erroneous.

The Commissioner argues that the error is harmless because the ALJ found that Ms. Murray was capable of returning to her past relevant work as a telemarketer, which is described as sedentary in the Dictionary of Occupational Titles (DOT), 299.357-014. Dr. Westfall's findings are consistent with the requirements of both light and sedentary work. Further, as the Commissioner points out, the description of telemarketer in the DOT states that postural requirements such as climbing, stooping, kneeling, crouching and crawling, and environmental conditions such as dust and fumes, are not present in this job. I agree with the Commissioner that the error was harmless.

2. Application of the Medical-Vocational Guidelines.

The ALJ found that even if Ms. Murray could not return to her past relevant work as a telemarketer, she was still capable of doing other work under the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2, also referred to as the grids. For this reason, the ALJ found it unnecessary to call a vocational expert to establish that, if Ms. Murray could not return to her previous work as a telemarketer, she was still capable of performing other work in the national economy.

There are two ways for the Commissioner to meet her burden at step five of showing that there is other work in "significant numbers" in the national economy that claimant can perform: a) by the testimony of a vocational expert, or b) by reference to the Medical-Vocational Guidelines. Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the grids accurately and completely

28 - FINDINGS & RECOMMENDATION

describe a claimant's impairments, the ALJ may apply the grids instead of taking testimony from a vocational expert. <u>Holohan v. Massinari</u>, 246 F.3d 1195, 1208 (9th Cir. 2001). If they do not, the ALJ must also hear testimony from a vocational expert. <u>Id.</u>

Under the grids, a claimant who is considered a "younger individual," i.e., between the ages of 45 and 49, who is a high school graduate or more, and who is capable of doing sedentary, light or medium work, is considered not disabled. See Table No. 1, § 201.21, 201.22; Table No. 2, § 202.20-202.22; Table No. 3, § 203.28-31.

However, the grids are sufficient to support an ALJ's decision only when the claimant suffers solely from exertional limitations. <u>Id.</u> See also <u>Irwin v. Shalala</u>, 840 F. Supp. 751 (D. Or. 1993) and <u>Tackett</u>, 180 F.3d at 1101 (Reliance on grids appropriate only when grids accurately and completely describe claimant's abilities and limitations). Significant non-exertional impairments, including pain, postural limitations such as the inability to climb, stoop, kneel, crouch, and crawl, and environmental limitations such as inability to tolerate dust or gases, may make reliance on the grids inappropriate, unless the ALJ has determined that the claimant's non-exertional limitations do not significantly limit the range of work permitted by the claimant's exertional limitations. <u>Tackett</u>, 180 F.3d at 1101-02; Social Security Ruling 83-10.

The ALJ stated no reason for disregarding Dr. Westfall's postural and environmental limitations, and made no finding that these limitations did not significantly limit the range of work permitted by Ms. Murray's exertional limitations. Consequently, the ALJ's reliance on the grids for his finding that, even if Ms.

29 - FINDINGS & RECOMMENDATION

Murray were incapable of returning to her previous work, she was still capable of other work in the national economy, was erroneous. Nevertheless, as discussed above, Ms. Murray has not challenged the ALJ's step four finding that she was capable of returning to her previous relevant work as a telemarketer, so that the ALJ's error at step five is harmless.

### 3. Failure to call a vocational expert

Ms. Murray asserts that the ALJ erred by failing to call a vocational expert to support his step five finding. However, because Ms. Murray has not challenged the ALJ's finding that she was capable of returning to her previous work as a telemarketer, the ALJ's step five analysis was not necessary. I therefore find that this error was harmless as well. See Matthews v. Shalala, 10 F.3d 678, (9th Cir. 1993)(when claimant fails to meet her burden of proving inability to return to previous work, vocational expert's testimony not required.)

### 4. Failure to consider effects of other severe and nonsevere impairments on residual functional capacity

The ALJ found that Ms. Murray had "mild" difficulty maintaining concentration, persistence or pace. Tr. 27. Ms. Murray contends that the ALJ should have considered the "mild," or nonsevere, impairment in assessing her residual functional capacity, by submitting this limitation to a vocational expert for consideration.

The mere existence of an impairment is insufficient proof of a disability. Matthews, 10 F.3d at 680. The ALJ's finding that Ms. Murray's mental impairment was not severe necessarily meant that, under Social Security regulations, Ms. Murray did not have an

impairment that significantly limited her ability to perform the basic mental work activities. See 20 C.F.R. § 416.921(a). The ALJ was therefore not required to incorporate the limitations imposed by the nonsevere impairment into the assessment of Ms. Murray's residual functional capacity.

5. Failure to develop the record

The ALJ has a duty to fully develop the record, even when the claimant is represented by counsel. Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996). However, the ALJ's duty to develop the record is triggered "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001), as amended, 276 F.3d 453 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

Ms. Murray asserts that the ALJ failed to develop the record by addressing the evidence of the Social Security reviewing physicians, calling a vocational expert, incorporating her nonsevere limitations into the residual functional capacity assessment, and failing to call a medical expert. For the reasons discussed above, I find no error in the ALJ's failure to specifically address the findings of Dr. Westfall that Ms. Murray could do light or sedentary work, because her findings were necessarily incorporated into the ALJ's finding that Ms. Murray was capable of returning to her previous sedentary work as a telemarketer. Because Ms. Murray failed to carry her burden of demonstrating an inability to return to her previous work, the ALJ was not required to call a vocational expert. As discussed above, the ALJ was not required to incorporate nonsevere limitations into

31 - FINDINGS & RECOMMENDATION

his assessment of residual functional capacity. Ms. Murray has not pointed to evidence that was ambiguous or incomplete that would trigger the duty of the ALJ to further develop the record.[7]

## Conclusion

Because the ALJ's errors are harmless, based on his finding that Ms. Murray could return to her previous work, and because the ALJ's factual findings are based on substantial evidence in the record, I recommend that the Commissioner's decision be affirmed and that this case be dismissed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 8, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 22, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 24th day of March, 2005.


/s/   Dennis J. Hubel
                    Dennis J. Hubel
            United States Magistrate Judge

---

[7] Because Ms. Murray has not challenged the ALJ's findings with respect to her credibility, the record is sufficient to establish that Ms. Murray is not disabled.

32 - FINDINGS & RECOMMENDATION